UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Trustee for the benefit
of the registered Holders of UBS
Commercial Mortgage Trust 2018-C10,
Commercial Mortgage Pass-Through
Certificates, Series 2018-C10, by and
through Rialto Capital Advisors, LLC, in its
capacity as special servicer

     Plaintiff,

     v.                                 Case No. 3:20-CV-677 JD

410 SOUTH MAIN STREET LLC, et al.,

     Defendants.

**OPINION AND ORDER**

This lawsuit stems from a commercial loan transaction involving a single tenant retail building in Goshen, Indiana, and efforts that Plaintiff Wilmington Trust has undertaken to collect on the loan after default. Wilmington Trust named twelve entities and individuals as defendants in the suit, but only three have appeared. They are Defendants 410 South Main Street, Red Realty Holdings, and Sol Dayan (collectively "Defendants"). The other nine named defendants have all defaulted out.

Wilmington Trust and the Defendants have created a dense web of filings as they've litigated this lawsuit. But in short, there are three pending issues that need to be resolved. First, the Defendants have argued that Wilmington Trust was not the proper party to bring this lawsuit and that, as a result, the Court does not have subject matter jurisdiction to hear and decide the case. Second, Wilmington Trust has moved for summary judgment on four of the five claims it brought in its amended complaint. And third, Wilmington Trust has filed a motion to dismiss the

two counterclaims the Defendants brought against it. The Court will tackle each issue in turn, first confirming that it has subject matter jurisdiction and then explaining why summary judgment in Wilmington Trust's favor is appropriate both on its own claims and on the Defendants' counterclaims.

## A. Factual Background

Defendant 410 South Main Street ("410" or "Borrower") is an Indiana limited liability company that entered into a commercial loan agreement ("Loan") with Keybank National Association in the amount of $3 million in March 2018. There were several loan documents executed and delivered in connection with the Loan, including: 1) a promissory note in the original principal amount of $3 million ("Note"); 2) a loan agreement; 3) a mortgage; 4) an Assignment of Leases and Rents; and 5) a Guaranty Agreement that Defendant Moshe Rudich executed as the sole member and owner of 410. (DE 48-1; DE 48-2; DE 48-3.) Keybank recorded the mortgage and perfected its security interest in 410's personal property and fixtures in April 2018. (DE 48-3 at 2.) It then assigned all of its interest in the Loan to Plaintiff Wilmington Trust in May 2018. (DE 48-4 at 33–38.) Wilmington Trust participated in the assignment and is pursuing this litigation in its role as trustee for the benefit of the registered holders of UBS Commercial Mortgage Trust 2018-C10, Commercial mortgage Pass-Through Certificates, Series 2018-C10. The trust is a real estate mortgage investment conduit ("REIMC") trust.

As is common in situations involving loans such as the Loan here, the REIMC trust and Wilmington Trust entered into a Pooling and Servicing Agreement ("PSA") with various entities to help service and otherwise maintain the Loan, including using an entity named Rialto Capital Advisors as the Loan's special servicer. (DE 74-1.) The PSA assigned "all the right, title and

interest" in the Loan and documents to Wilmington Trust as trustee, but it also gave Rialto specific delegated abilities to service the Loan. (*Id.*)

Wilmington Trust's oversight of the Loan did not go smoothly after it was assigned the interests. 410 began missing monthly installment payments in December 2019 and continued missing monthly payments thereafter. In investigating the missed payments, Wilmington Trust learned that 410 had also been involved in a variety of transfers and liens related to the real estate underlying the loan, none of which were disclosed to Wilmington Trust and none of which were executed with Wilmington Trust's prior written consent as the loan documents required. The transfers and liens triggered carveouts to what was originally the nonrecourse loan agreement that allowed Wilmington Trust to accelerate payment on the Loan and seek more onerous fees and interest. (DE 48-1; DE 48-2 at 76–77, 89–90.)

The liens and transfers at issue are as follows. First, 410 obtained a mortgage from Defendant Park National Capital Funding in December 2017 for the real estate covered under the Loan and never disclosed that mortgage to Wilmington Trust. 410 eventually allowed Park National to record that mortgage in May 2020. (DE 48-5 at 2–20.) Second, Mr. Rudich transferred his interest in 410 two times. He first pledged his interest to Defendant Scopus Equity, LLC in August 2018 (DE 48-5 at 22–29) and then pledged that same interest to Defendant Red Realty in April 2019 (DE 48-4 at 46). Third, 410 entered into a series of restrictions on the property. Those restrictions included: a restriction with Defendants Judah Zelmanovitz and Neil Fink recorded in May 2018 (DE 48-4 at 54); a restriction with Defendant Law Offices of David Fleischmann, P.C. recorded in June 2019 (DE 48-4 at 58); a restriction with Defendant Levitin & Associates, P.C., with Defendant New York Capital, LLC as declarant, recorded in August 2019 (DE 48-4 at 60); and a restriction with Defendant Sol Dayan

recorded in October 2019 (DE 48-4 at 62). Each of the restrictions pledged that 410 would not take actions creating a security interest in the underlying real estate without the consent of the other party to the restriction. Fourth, 410 conveyed the underlying real estate to Defendant TAC Capital by quitclaim deed in December 2019. (DE 48-4 at 66.)

Red Realty, purportedly acting for 410 after it received Mr. Rudich's interest in the limited liability company, began requesting a mortgage statement in the first few months of 2020 so that it could begin addressing 410's missed monthly installment payments that had begun to pile up and had put the Loan into default. Red Realty received a balance statement from Keybank on March 12, 2020, that stated the current balance to be paid as of that date was $87,279.66 plus per diem interest after March 12 of $416.67 ("Balance Statement"). (DE 54-1 at 18.) The Balance Statement also contained language stating that it was "null and void" after 2 p.m. on March 12 and that "neither . . . receipt of [the] statement nor acceptance of any partial payment, or any future partial payment, shall be deemed to amend or modify the terms of the loan documents, nor cure or waive the default existing under the Loan." (*Id.*)

410, Red Realty, and Mr. Dayan interpreted the Balance Statement as an agreement that if 410 paid the amount listed, Wilmington Trust would reinstate the Loan and waive any past defaults. (DE 70 at 7.) The Defendants have alleged that they began collecting funds to make payments in line with that agreement. But Wilmington Trust saw the Balance Statement as only giving a snapshot of the amount owed on the particular day it was issued and nothing more. On March 25, 2020, as the full extent of 410's defaults and unauthorized transfers and liens were becoming clear, Wilmington Trust notified 410 and Mr. Rudich by letter that it was choosing to accelerate the required payments under the loan agreement. Wilmington Trust gave 410 and Mr.

Rudich until April 8, 2020, to pay all sums due under the loan agreement, including additional fees and interest triggered by the defaults, transfers, and liens. (DE 48-4 at 70–74.)

The Defendants, maintaining their view that the Balance Statement was a valid agreement that could be enforced, did not pay Wilmington Trust the full, accelerated amount Wilmington Trust had requested. Instead, they made a series of payments in early April that totaled $86,446.66. (DE 64-1 at 26.) Having not received full payment, Wilmington Trust sent a follow-up letter on June 15, 2020, to 410, Mr. Rudich, and all of the parties who had entered into transfers or liens. The letter notified the parties that the transfers and liens had been prohibited under the loan agreement and that 410 and Mr. Rudich were fully and personally liable for the entire amount due under the Loan as a result. (DE 48-4 at 76–80.) 410 and Mr. Rudich did not pay after the follow-up letter either.

Wilmington Trust thus brought suit against 410, Mr. Rudich, and the other parties involved in the transfers and restrictions. They sought judgments against 410 for breach of the Note, against Mr. Rudich for breach of the Guaranty Agreement, and against all of the defendants for foreclosure of the mortgage and foreclosure of personal property. (DE 1, DE 4, DE 48.) Of the twelve defendants named in the suit, only 410, Red Realty, and Mr. Dayan ever appeared. (DE 51.) The Defendants also filed two joint counterclaims against Wilmington Trust, one for breach of contract and one for negligent misrepresentation. (DE 51 at 19–22.) A Clerk's Default was entered against the nine defendants who did not appear, including Mr. Rudich, Fleischmann P.C., Levitin & Associates, Mr. Zelmanovitz, Mr. Fink, New York Capital, TAC Capital, Park National Capital Funding, and Scopus Equity. (DE 28; DE 55; DE 56.)

**B. Standard of Review**

The Defendants have raised jurisdictional concerns that, while not appearing in a separately filed motion to dismiss, raise the same issues generally dealt with under Federal Rule of Civil Procedure 12(b)(1).[1] Rule 12(b)(1) authorizes dismissal of claims over which the Court lacks subject matter jurisdiction. If a jurisdictional challenge only contests the sufficiency of the plaintiff's allegations regarding subject matter jurisdiction, the Court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015); *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). If, however, the jurisdictional challenge denies or contests the truth of the plaintiff's jurisdictional allegations, the Court may look beyond the pleadings and view whatever evidence has been submitted on the issue to determine whether subject matter jurisdiction exists. *Apex Dig., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). The burden of establishing proper federal subject matter jurisdiction rests on the parties asserting it, which for purposes of this motion is Wilmington Trust. *Muscarello v. Ogle Cnty. Bd. of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010).

There are also motions for summary judgment discussed in this order. Summary judgment is proper when the moving party shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Yet, where a

---

[1] The Defendants' choice to twice raise their jurisdictional arguments in response to Wilmington Trust's motion for summary judgment instead of in a separate motion to dismiss contradicted a prior instruction from the Court. (DE 47 at 3.)

factual record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). The nonmoving party cannot simply rest on the allegations or denials contained in its pleadings though. It is not enough for the nonmoving party to simply show there is some metaphysical doubt as to the material facts or present a mere scintilla of evidence in support of its position. Instead, there must be evidence on which the jury could reasonably find in favor of the nonmoving party. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita*, 475 U.S. at 586–87; *Anderson*, 477 U.S. at 252).

**C. Discussion**

Because this order addresses several different motions and issues, it is broken down into three general parts. First, it addresses the subject matter jurisdiction issue that the Defendants raised, ultimately concluding that the Court has jurisdiction. Second, it analyzes Wilmington Trust's motion for summary judgment on its own claims. And third, it addresses Wilmington Trust's motion to dismiss the Defendants' counterclaims. The Defendants' arguments against Wilmington Trust's two motions are largely the same and based on what the Court will explain is a flawed interpretation of the Balance Statement that Keybank issued in March 2020. (DE 60 at 9–17; DE 70 at 15–24.) Because the arguments are similar, the Court's discussion related to Wilmington Trust's motion on the Defendants' counterclaims refers back and incorporates much of its analysis related to Wilmington Trust's motion for summary judgment on its own claims.

### *1. Subject Matter Jurisdiction*

Wilmington Trust's only jurisdictional hook to maintain this lawsuit in federal court is diversity jurisdiction under 28 U.S.C. § 1332. (DE 48 ¶ 15.) Section 1332 allows a federal court to exercise jurisdiction over a civil action where the amount in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). There is no question here that the amount in controversy exceeds $75,000, only whether there is complete diversity between the parties.

At first glance, it seems clear that there is complete diversity. Wilmington Trust, as a national bank, is "a citizen of the state in which its main office, as set forth in its articles of association, is located." *Wachovia Bank v. Schmidt*, 546 U.S. 303, 307 (2006). It is undisputed that Wilmington Trust is thus a citizen of Delaware. (DE 48 ¶ 1.) And Wilmington Trust brought this lawsuit in its capacity as trustee for a real estate mortgage investment conduit ("REIMC") trust (DE 74-1; DE 78 at 4), which means its own citizenship, and not that of the trust, is what counts for subject matter jurisdiction purposes. *Americold Realty Trust v. ConAgra Foods, Inc.*, 577 U.S. 378, 382 (2016) (citing *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 462–66 (1980)) ("[W]hen a trustee files a lawsuit or is sued in [its] own name, [its] citizenship is all that matters for diversity purposes."). Because none of the defendants in this lawsuit share Wilmington Trust's Delaware citizenship, it would appear at the outset that there is complete diversity.

The Defendants do not question the holdings in *Americold* or *Navarro*, dispute Wilmington Trust's Delaware citizenship, or disagree that the underlying trust is an REIMC trust. (DE 75; DE 80.) Instead, their challenge to jurisdiction centers on their argument that Wilmington Trust is not a real party in interest to this controversy. According to the Defendants, Rialto Capital Advisors, the special servicer on the Loan, is the true real party in interest because

the PSA gave it discretion to service the Loan, including by pursuing litigation. (DE 75 at 5–6; DE 80 at 5–7.) Thus, in the Defendants' view, it should have been Rialto, not Wilmington Trust, that sued and Rialto's citizenship, not Wilmington Trust's, that should count for diversity purposes. Because Rialto allegedly shares New York citizenship with several defendants, the suit would thus fall outside this Court's subject matter jurisdiction. (DE 75 at 12–13; DE 80 at 8–11.)

The Defendants' argument is flawed for two reasons. First, they mistake the latitude the PSA gave Rialto to service the loan for language that dispossesses Wilmington Trust of the power to initiate suit as the real party in interest. And second, they do not recognize that it is the real and substantial party to the controversy, not necessarily the real party in interest, that matters when determining diversity jurisdiction.

The Defendants' real party in interest argument stems from Federal Rule of Civil Procedure 17, which requires that a civil action "must be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17(a). The "real party in interest" is the person or entity that possesses the right or interest to be enforced through litigation, and the purpose of Rule 17 is to protect the defendant against a subsequent action by the party actually entitled to recover. *See RK Co. v. See*, 622 F.3d 846, 850 (7th Cir. 2010 (citing *Rawoof v. Texor Petroleum Co., Inc.,* 521 F.3d 750, 756 (7th Cir.2008); 4 Moore's Federal Practice § 17.10 (3d. 2009)). "In determining the real party in interest, the key consideration is not who will ultimately benefit from the recovery, but rather who, by the substantive law, possesses the right sought to be enforced." *Etransmedia Tech., Inc. v. Allscripts Healthcare, LLC*, 448 F. Supp. 3d 910, 913–14 (N.D. Ill. 2019) (citing *Illinois v. Life of Mide-Am. Ins. Co.*, 805 F.2d 763, 764 (7th Cir. 1986); *Capital Asset Mgmt., LLC v. Chicago Props., LLC*, 610 F.3d 497, 500–01 (7th Cir. 2010); 6A Charles

Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 1543 (3d ed. 2010)) (internal quotation marks omitted).

Rule 17 only deals with determining the correct party with the capacity to sue though. It does not determine which party's citizenship counts for assessing jurisdiction. *See* 4 Moore's Federal Practice – Civil § 17.13 (2021). Determining which party's citizenship counts for jurisdiction instead requires finding the real and substantial party to the controversy. There is a "rough symmetry" between Rule 17's real party in interest standard and determining the real and substantial party to the controversy for purposes of diversity, but the two rules serve different purposes and need not produce identical outcomes in all cases. *See Navarro*, 446 U.S. at 463 n.9 (giving the example that a labor union may file suit in its own name as a real party in interest but must rely upon the citizenship of each of its members as the real parties to the controversy for diversity purposes). Thus, a party may be able to show it is the real party in interest and was the proper party to bring a case, but it must additionally be able to show that it is also the "real and substantial party to the controversy" if it wants to ensure that its citizenship is the citizenship that counts in a diversity jurisdiction analysis. *See Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186, 193–94 (2d Cir. 2003).

And an agency relationship between parties can affect the real and substantial party to the controversy determination. "To establish whether a plaintiff is a real and substantial party to the controversy, a crucial distinction must be made between a plaintiff who sues solely in his capacity as an agent, on the one hand, and, on the other, a plaintiff who sues not only as an agent, but also as an individual who has his own stake in the litigation." *Id.* (internal quotation marks omitted). "Where a plaintiff brings a suit solely in his representative capacity, the citizenship of

the represented party, and not that of the representative, controls. *Id.* (citing *Moore's Federal Practice*, § 17.13[2][b]).

The Court starts its analysis with the parties' real party in interest dispute. The Defendants argued that the powers the PSA gave Rialto to bring and participate in lawsuits as the special servicer for the Loan effectively dispossessed Wilmington Trust of any ability or right to bring this lawsuit as the real party in interest. (DE 75 at 11–12; DE 80 at 8–9.) The Defendants relied on two cases to make their argument. In the first case, the Seventh Circuit found that a special servicer that brought suit as the plaintiff could continue as the real party in interest given it was delegated certain litigation powers and servicing duties under the PSA. *CWCapital Asset Mgmt., LLC v. Chi. Props., LLC*, 610 F.3d 497 (7th Cir. 2010). The second case, *In re Sterling Estates (Delaware), LLC*, relied on *CWCapital* to find that a special servicer that was the majority certificate holder in a trust and had a limited power of attorney agreement from the trust to pursue litigation as the real party in interest could bring suit as a real party in interest. 2011 WL 45602 (Bankr. N.D. Ill. 2011). Wilmington Trust does not dispute the holdings in either case. Instead, it argues that the cited cases, and specifically *CWCapital*, only establish that the terms of a PSA *can* permit a special servicer to sue in its own name if the special servicer chooses to do so, not that the terms of a PSA divest the trustee for whom that special servicer acts from bringing suit when it is the one that chooses to do so. (DE 78 at 7.) The Court agrees with Wilmington Trust's reading of those cases and does not find the PSA here precluded Wilmington Trust from suing as the real party in interest.

To start, the PSA conveyed the interests at issue in this lawsuit to Wilmington Trust, not Rialto, in a way that put Wilmington Trust in the standard role of a trustee that could sue. The PSA specifically conveyed "all the right, title and interest" in the loan agreements to Wilmington

Trust as trustee. (DE 74-1 at 131–32.)  The "plain meaning" of such a conveyance "ordinarily includes the power to bring suit to protect and maximize the value" of the granted interest as the real party in interest. *Lasalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 180 F. Supp. 2d 465, 471 (S.D.N.Y. 2001); *see also Justice. v. Wells Fargo Bank Nat'l Ass'n*, 674 F. App'x 330, 332 (5th Cir. 2016), *as revised* (Mar. 22, 2017); *LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings*, 237 F. Supp. 2d 618, 632 (D. Md. 2002). It follows that Wilmington Trust, as the holder of the interests at issue, can sue to enforce and collect on those interests.

Additionally, the entirety of the PSA suggests that Rialto's powers to act as special servicer are only the result of delegated authority from Wilmington Trust, not separate authority given solely to Rialto in a way that dispossesses Wilmington Trust of its powers. *See, e.g.*, (DE 74-1 at 163) (explaining that Rialto is "authorized and empowered by the Trustee" to carry out servicing duties related to, among other things, delivering financing statements, modifications to mortgage files, and complaints or pleadings to begin or terminate legal actions); *see also* (DE 74-1 at 34, 51, 197, 199,  205–06, 210) (making clear that the special servicer activities are to be done "on behalf of the Trustee"); *see also* Restatement (Third) of Trusts § 80 (2007) (recognizing a trustee's ability to delegate certain duties related to administering a trust). That type of empowerment of Rialto through delegation does not mean Wilmington Trust was stripped of its power as a traditional REIMC trustee to sue as the real party in interest. *See Nomura*, 180 F. Supp. 2d at 470 (finding a trustee was a real party in interest when "it is clear that [the trustee] is a traditional trustee who simply contractually delegated some of its duties").

It is true that one of the powers Wilmington Trust delegated through the PSA was the ability to "represent the interests of the Trust in any litigation relating to the rights and obligations of the Trust, or of the Mortgagor or other Borrower-Related party under the related

Mortgage Loan documents." (DE 74-1 at 300.) But that delegated ability to litigate still does not divest Wilmington Trust of authority to sue. Rialto's litigation powers are still subject to Wilmington Trust's oversight given that to obtain judgment against a borrower, Rialto can only prepare the relevant court pleadings while Wilmington Trust, as trustee, is the one that must actually execute those pleadings. (DE 74-1 at 214); *see Nomura*, 180 F. Supp. 2d at 471 (citing the need for the trustee to execute litigation documents prepared by the special servicer as an indication that the trustee is the real party in interest); *Lehman*, 237 F. Supp.2d at 633 ("Merely because the PSA in this case delegates to [the special servicer] the right to institute a suit in its capacity as Special Servicer does not affect the basic premise that the trustee of an express trust is the real party in interest").

Wilmington Trust's interest in and control of the money Rialto collects through its servicing activities, as well as its ultimate responsibility for servicing the Loan, further dispels any suggestion that the PSA makes Wilmington Trust anything less than an active trustee with the ability to bring suit as the real party in interest. *See* (DE 74-1 at 34–35); (DE 74-1 at 392) ("The Trustee . . . may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys"); *see also Wells Fargo Bank, N.A. v. CCC Atl., LLC*, 905 F. Supp. 2d 604, 612 (D.N.J. 2012) (explaining that a trust's ownership of money collected from the servicing of a loan supports finding the trust was a real party in interest).

Each of these aspects of the PSA suggest to the Court, as they did to other courts confronted with similar special-servicer-as-real-party-in-interest arguments, that it is not only possible but common that a PSA delegates certain trustee duties, like pursuing legal claims, to a special servicer without divesting the trustee of the ability to bring suit as the real party in

interest. *See Nomura*, 180 F. Supp. 2d at 471 (citing *Navarro*, 446 U.S. at 464) (The Trustee "possesses certain customary powers to hold, manage and dispose of assets for the benefit of" the certificate holders and "is a real party to the controversy for purposes of diversity jurisdiction"); *Lehman*, 237 F. Supp. 2d at 633; *U.S. Bank Nat. Ass'n v. Nesbitt Bellevue Prop. LLC*, 859 F. Supp. 2d 602, 607 (S.D.N.Y. 2012) (finding that the trustee could bring suit in its own right, as a real party in interest under Rule 17, notwithstanding the role the PSA accorded the special servicer).

And the Seventh Circuit's holding in *CWCapital* does not contradict the Court's conclusion. As Wilmington Trust pointed out in its briefing, *CWCapital* did not reach the issue in dispute here of whether a PSA's grant of powers to a special servicer could dispossess a trustee of its ability to bring suit. *CWCapital* instead only considered whether the terms of a PSA could allow a special servicer to bring suit as the real party in interest if the special servicer chose to do so. *CWCapital*, 610 F.3d at 502. Therefore, the holding only established that a special servicer *could* be a real party in interest, not that a special servicer *must* be *the* real party in interest given particular delegated powers in a PSA. (DE 78 at 7–8.) This distinction and interpretation of the *CWCapital* holding is not new or unique. A New York federal judge made a similar distinction when he differentiated *CWCapital* from the case before him which, like this one, centered on the argument that the special servicer, not the trustee, was the real party in interest. *See Nesbitt*, 859 F. Supp. 2d at 608 n.2 ("Moreover, the issue in this case is not, as it was in *CWCapital*, whether the Special Servicer *could* have brought the claim in its own right, but whether the citizenship of the special servicer matters for the purposes of diversity jurisdiction.") (emphasis in original). The Court thus finds that *CWCapital* does not preclude

Wilmington Trust from maintaining this lawsuit as the real party in interest when Wilmington Trust, not Rialto, chose to bring the lawsuit as the plaintiff.

That finding defeats the Defendants' jurisdictional argument that was premised on Rialto, not Wilmington Trust, being the real party in interest in this lawsuit. However, the Court will go on to explain why, even if it had agreed with the Defendants that Rialto was the true real party in interest and should have brought the claim, it would not change the fact that there would still be complete diversity between the parties and proper subject matter jurisdiction. Failure to abide by Rule 17 does not result in automatic dismissal but instead results in giving the true real party in interest an opportunity to ratify, join, or be substituted into the action. And after ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest. *See CWCapital*, 610 F.3d 497 at 502 (citing Fed. R. Civ. P. 17(a)(3)) (internal quotations marks omitted). Treating this suit as if Rialto had originally sued does not change the fact that Wilmington Trust's diverse citizenship counts for the jurisdictional analysis.

As the Court already noted, finding the real party in interest to a suit is not the same as finding the real and substantial party to the controversy for purposes of diversity jurisdiction. *See Navarro*, 446 U.S. at 463 n.9. The Defendants' reliance on *CWCapital* and *Sterling Estates* does nothing to help in determining the real and substantial party to the controversy question because neither case dealt with that question or diversity jurisdiction at all. The Defendants' briefing also is of little help because they appear to have incorrectly assumed that a real party in interest's citizenship automatically counts in a diversity analysis. (DE 75; DE 80.) That is not necessarily true, and in particular not true in this case, because even if Rialto were the real party in interest, Rialto would be litigating as Wilmington Trust's representative under the PSA, which would make Wilmington Trust the real and substantial party to the controversy.

A review of the PSA makes clear that Rialto's role as a special servicer, no matter how many duties it may be given, is to act as an agent and represent Wilmington Trust as the active trustee of the REIMC trust in certain dealings related to Wilmington Trust's interest in the Loan. *See, e.g.*, (DE 74-1 at 34, 51, 197, 199, 205–06, 210, 392) (making clear that Rialto's activities are to be done "on behalf of the Trustee" and that Wilmington Trust can execute its duties "directly or by or through agents or attorneys"); Restatement (Third) of Trusts § 80 (2007). Further, Rialto's stake in this litigation is solely tied to its duties under the PSA and any money Rialto collects through its duties belongs to Wilmington Trust for the benefit of the trust's certificate holders, not Rialto. (DE 74-1 at 34–35.) Rialto thus does not have the necessary stake to be classified as a real and substantial party whose citizenship must be factored into a jurisdictional analysis. *See Blue Cross Blue Shield v. Endo Pharmaceuticals*, 454 F. Supp. 3d 686, 692 (E.D. Mich. 2020) (finding the party collecting money on behalf of another is a mere conduit, not a real and substantial party to the controversy whose citizenship counts for diversity purposes); *see also 390 Park*, 2017 WL 2684069 at *3; *U.S. Bank Nat'l Ass'n v. White Clay Assocs., LLC*, 2014 WL 2805305, at *2 (D. Del. June 17, 2014); *Nesbitt*, 859 F. Supp.2d at 609.

In suits where the party bringing the suit is doing so solely in its representative capacity, the citizenship of the represented party, and not that of the representative, controls. *See Oscar Gruss*, 337 F.3d at 194 (citing Moore's Federal Practice § 17.13[2][b]); *see also N. Tr. Co. v. Bunge Corp.*, 899 F.2d 591 (7th Cir. 1990); *Nat'l Ass'n of Realtors v. Nat'l Real Est. Ass'n, Inc.*, 894 F.2d 937 (7th Cir. 1990). Thus here, even if Rialto were deemed to be the real party in interest and had been the party that brought suit as the plaintiff, the Court would have to look past Rialto's citizenship to Wilmington Trust's citizenship as the citizenship of the real and substantial party to the controversy. "[A] trustee is a real party to the controversy for purposes of

diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." *Navarro*, 446 U.S. at 465. Wilmington Trust is the trustee for the Loan at issue, holds "all the right, title and interest" under the PSA (DE 74-1 at 131–32), and has a fiduciary obligation to the trust's certificate holders to see that the Loan is paid and that the value of the collateral is maintained. *See* (DE 74-1 at 392); *see also Doermer v. Oxford Fin. Grp., Ltd.*, 884 F.3d 643, 647 (7th Cir. 2018); *Demarest v. HSBC Bank USA, N.A. as Tr. for registered holders of Nomura Home Equity Loan, Inc., Asset-Backed Certificates, Series 2006-HE2*, 920 F.3d 1223, 1229 (9th Cir. 2019); *Nesbitt*, 859 F. Supp. 2d at 608. It thus follows that Wilmington Trust has the true stake in the litigation that makes it a real and substantial party because it holds and controls the rights and interests that are at the center of this lawsuit. *See Oscar Gruss*, 337 F.3d at 193–94.

The fact that this action is brought "by and through" Rialto as the special servicer does nothing to change that. *Compare* (DE 80 at 7) (Defendants taking issue with Wilmington Trust bringing this suit "'by and through Rialto Capital Advisors, LLC, in its capacity as special servicer'") *with Wells Fargo Bank, N.A. v. 390 Park Ave. Assocs., LLC*, 2017 WL 2684069, at *3 (S.D.N.Y. June 21, 2017) (quoting *Wells Fargo Bank, N.A., Tr. v. Konover*, 2009 Wil 2710229, at *2 (D. Conn. Aug. 21, 2009), *aff'd sub nom. Wells Fargo Bank, N.A. v. Konover Dev. Corp.*, 630 F. App'x 46 (2d Cir. 2015)) ("[D]elegation to a servicer is not relevant [to the real and substantial party inquiry] because, in so delegating, the Trustee does not relinquish the powers it holds as a Trustee."). Wilmington Trust would thus be the real and substantial party to the controversy even if Rialto were found to be the real party in interest. And because Wilmington Trust is completely diverse from all of the defendants in this lawsuit, the Court can be assured of proper subject matter jurisdiction and proceed to the merits of the case.

### 2. Defendants' Defenses to Summary Judgment

Having determined that there is proper subject matter jurisdiction, the Court moves to Wilmington Trust's motion for summary judgment on four of the five claims in its amended complaint. Wilmington Trust has specifically requested judgment against 410 for breach of the Note, against Mr. Rudich for breach of the Guaranty Agreement, and against all of the defendants for foreclosure of the mortgage and foreclosure of personal property. (DE 64 at 3–6.) The Defendants oppose summary judgment on the claims not because they disagree that there were defaults and breaches under the loan documents, but instead because they argue that they have various defenses to their defaults and resulting liability which create genuine disputes of material fact. The Defendants also made multiple references to Wilmington Trust filing its motion too early and before discovery could be fully completed (DE 60 at 11–12; DE 70 at 16, 21), but the Court notes that both of Wilmington Trust's motions in this case were timely under the Federal Rules of Civil Procedure. Fed. R. Civ. P. 56 (allowing a party to file for summary judgment "at any time until 30 days after the close of all discovery").

Given the Defendants' focus only on certain defenses in their opposition to summary judgment, many of the material facts in this case remain undisputed. The parties agree that this case is based on a legitimate, $3 million loan from Keybank to 410 regarding a single tenant building in Goshen, Indiana. And they do not dispute that there was a valid loan agreement and promissory note executed and delivered in connection with the Loan or that Keybank validly assigned its interest in the Loan and loan documents to Wilmington Trust. There is further no dispute that 410 failed to make monthly installment payments starting in December 2019 and continuing thereafter, which constituted a default under the loan agreement. Additionally, the Defendants have not disputed that they allowed restrictions on the underlying real estate and

transfers of interest without Wilmington Trust's prior written consent or that the unauthorized actions allowed Wilmington Trust to accelerate payments and seek more onerous fees under the nonrecourse carveout provisions within the loan documents. (DE 70.)

Because those core facts are undisputed, and the Defendants' arguments against summary judgment are only tied to alleged defenses to default, the Court finds it easiest to first address the validity of the Defendants' defenses. After explaining why none of the defenses raise a genuine dispute of material fact that would preclude summary judgment, the Court will move on to explain why summary judgment is warranted based on the clear language of the loan documents and the undisputed events that occurred.

### a.   *Breach of the Balance Statement*

The Defendants first argued that there is a genuine dispute about whether Wilmington Trust waived the defaults for which it is now trying to collect by entering into a contract or agreement with the Defendants that it then failed to honor. The contract or agreement, according to the Defendants, is the March 12, 2020, Keybank Balance Statement. The Defendants argued that the Balance Statement represented an agreement by Wilmington Trust to reinstate the Loan and waive any events of default if the Defendants paid the amount listed on the statement. In the Defendants' view, the Balance Statement created both a binding contract and a valid credit agreement under the Indiana Lender Liability Act, Ind. Code § 26-29-1; 226-2-9-4. (DE 70 at 15–16.) Wilmington Trust has adamantly denied any intent to enter into such an agreement and has maintained that the language contained in the Balance Statement itself precludes finding it could be considered an agreement under either the ILLA or traditional norms of contract formation. (DE 72 at 7.)

Under the ILLA, a "credit agreement," which includes an agreement to forebear or make any other financial accommodation, is enforceable if: 1) it is in writing; 2) that writing sets forth all material terms and conditions, and; 3) that writing is signed by both parties. *See* Ind. Code §§ 26-2-9-1 (definition of "credit agreement"); 26-2-9-4(b) (requirements). All material terms and conditions must be embodied by the singular, signed writing. A combination of multiple writings does not suffice to form a single agreement. *See Wabash Grain, Inc. v. Bank One, Crawfordsville, NA*, 713 N.E.2d 323, 326 (Ct. App. Ind. 1999).

While the Balance Statement is clearly in writing, which satisfies the first element under the ILLA, it fails to satisfy the second and third elements. The Defendants' argument that the second element under the ILLA was met rests on the Balance Statement allegedly setting a future date when payment could be made and a promise to take action if the Defendants paid the amount listed on the Balance Statement. (DE 70 at 16–17.) But the Balance Statement does neither of those things.

First, there was no future date provided for when payment could be made. The Defendants pointed to the Balance Statement's language stating "this Balance Statement is null and void after 2:00 P.M. Central Standard Time on [March 12, 2020]" as providing a firm date and time for payment to be made. (DE 60 at 11; DE 70 at 16–17.) While that portion of the Balance Statement may have listed a date, the date it listed was not a "future" date. It was instead the date upon which the Balance Sheet was created and sent. (DE 54-1 at 18.) Further, nothing within the language the Defendants cited directed the Defendants to make any payment or indicated that payment would only be accepted until 2 p.m. on March 12. The language instead, at best, simply stated the time after which the estimated amount listed within the Balance Statement would no longer be accurate.

20

Second, even if there had been a future date for when payment could be made, there was no language promising any future action would be taken if the amount listed were paid. In fact, the Balance Statement explicitly stated that it should not be read as promising that any future action would be taken at all. Specifically, it informed the recipient that "if your loan has matured, or is otherwise in default, neither your receipt of this statement nor acceptance of any partial payment, or any future partial payment, shall be deemed to amend or modify the terms of the loan documents, nor cure or waive the default existing under the Loan. Lender reserves all of its rights and remedies under the loan documents, at law or in equity." (*Id.*) The Court cannot find anything within the Balance Statement that could have led the Defendants to believe that Wilmington Trust was promising to take action to reinstate the Loan or cure any defaults by having the Balance Statement issued. It thus follows that the Court cannot find any basis to conclude that the Balance Statement set forth all material terms and conditions of the agreement as is required under the ILLA.

Even if the Defendants had satisfied the first two ILLA elements by showing that the Balance Statement was both a writing and set forth all material terms and conditions for an agreement though, they would still not be able to succeed with their ILLA argument because the Balance Statement was not signed by either party. Ind. Code § 26-2-9-4(b). The Defendants argued, without any supporting authority, that the Court should find the Balance Statement was signed by both parties "based upon the doctrine of incorporation by reference." (DE 60 at 13; DE 70 at 17.) In short, the Defendants argued that because the Balance Statement references the Loan, and the Loan was signed by both parties, the Balance Statement could be construed as being signed by both parties. (*Id.*) As Wilmington Trust points out, that reasoning would expand the ability to modify the Loan under the ILLA beyond logic by allowing any document that

references the underlying Loan, including, for example, Wilmington Trust's later demand letters to 410 for payment, to be construed as being signed by both parties and enforceable under the ILLA just because they referenced the Loan. (DE 63 at 4.) The Court has found no basis for extending the ILLA's signature requirement so broadly and finds, for all of the reasons enumerated in the preceding paragraphs, that the Defendants have failed to show a basis for treating the Balance Statement as an agreement under the ILLA.

For many of the same reasons just discussed, the Balance Statement does not qualify as a valid contract between the parties either. Whether a contract exists is a question of law. *Wolvos v. Meyer*, 668 N.E.2d 671, 678 (Ind. 1996). The basic requirements for a contract include an offer, acceptance, consideration, and a meeting of the minds of the contracting parties. *Batchelor v. Batchelor*, 853 N.E.2d 162, 165 (Ind. Ct. App. 2006). The Defendants have failed to show these core contract elements were present. The only "offer" the Defendants have pointed to is the one to reinstate the Loan and cure the defaults that they unilaterally read into the Balance Statement despite the Balance Statement explicitly stating it did not amend, modify, cure, or waive any existing default under the Loan. (DE 54-1 at 18; DE 70 at 16.) Additionally, the Defendants never presented evidence that they accepted the alleged "offer" within the March 20 at 2 p.m. deadline that they also read into the Balance Statement. (DE 70.) And even if the Defendants had been able to show proper offer, acceptance, and consideration, there is no evidence to show a meeting of the minds occurred. Under these circumstances, no reasonable factfinder could conclude there was a breach of contract or agreement. There is thus no genuine dispute of material fact that would preclude summary judgment.

        *b.*     *Promissory Estoppel*

The Defendants' attempt to defeat summary judgment by presenting a promissory estoppel defense tied to the Balance Statement similarly falls short. (DE 70 at 17.) A party asserting promissory estoppel must establish five elements: 1) a promise by the promissor; 2) that was made with the expectation that the promisee would rely on it; 3) and induces reasonable reliance by the promisee; 4) of a definite and substantial nature; 5) in a way where injustice can be avoided only be enforcement of the promise. *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 581 (Ind. 2007).

As an initial matter, the Defendants' promissory estoppel argument was a mere three paragraphs, contained caselaw citations only to explain the general promissory estoppel standard, and cited to no evidence in the record for support. The Defendants instead only leveled the general allegation that "[b]ased on Plaintiff's representations [in the Balance Statement], Red [Realty] was ready, willing and able to reinstate the loan and pay the sum of $87,279.66 plus per diem interest after March 12, 2020." (DE 70 at 17–18.) They also alleged that "Red [Realty] took the steps necessary to obtain the funds to reinstate the loan in reasonable reliance that Plaintiff would honor the Balance Statement" but that "[w]ithout explanation, Plaintiff made an about face and refused to honor the Balance Statement, damaging Defendants." (DE 70 at 18.) These bare allegations without citation to evidence in the record are deficient at this summary judgment stage and give no basis to find the Defendants' promissory estoppel defense is valid much less that it would defeat summary judgment. *See Warsco v. Preferred Tech. Grp.*, 258 F.3d 557, 563 (7th Cir. 2001) ("The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence.").

Even looking past the limited argument and evidence though, the Defendants fall short because they staked their argument to their flawed reading of the Balance Statement. The Balance Statement language clearly did not make a promise to reinstate the Loan or cure defaults. (DE 54-1 at 18.) Without a promise, promissory estoppel fails from the start. But the Court also notes that other elements would also be lacking because there is no evidence that Wilmington Trust sent the Defendants the Balance Statement with the expectation that they would rely on it as they did or that the Defendants' reliance on the Balance Statement as a promise to reinstate the Loan and cure defaults despite the Balance Statement's language explicitly stating otherwise was at all reasonable.

Further, even if the Court were to give the Defendants the benefit of the doubt and interpret the Balance Statement like the Defendants did, it would still have to read the March 12 at 2 p.m. expiration time as the time at which the Defendants had to act to take advantage of the promise. (DE 60 at 11–12; DE 70 at 16–17.) All of the evidence before the Court shows that the Defendants not only did not meet that deadline, but that even when they did make payments two months later, their total payment was for a lesser amount than was listed on the Balance Statement. (DE 64-1 at 26.) That further undermines the Defendants' argument that they validly relied on the supposed promise.

Ultimately, there is no indication other than the Defendants' bare allegations that the Balance Statement constituted a promise, that the Defendants relied on the promise, or that their reliance could be considered reasonable in light of the clear language in the Balance Statement explaining it did not modify the terms of the Loan or cure default. Given those circumstances, no reasonable factfinder could conclude the Defendants would be able to succeed on a promissory

estoppel claim. There are thus no genuine disputes of material fact related to the Defendants'
promissory estoppel defense that would preclude summary judgment.

        *c.*     *Doctrine of Unclean Hands*

The Court next moves to the Defendants' argument that the Court must apply the doctrine
of unclean hands to bar Wilmington Trust from succeeding on the merits at this summary
judgment stage. The doctrine is designed to prevent a party that behaved inequitably or acted in
bad faith from benefitting from that improper behavior. *See Packers Trading Co. v. Commodity
Futures Trading Comm'n*, 972 F.2d 144, 148 (7th Cir. 1992) (internal quotations omitted). There
is no exact formula for applying the doctrine and courts thus generally have discretion when
determining whether to apply it. *Id.* at 149. The doctrine is not favored under Indiana law "and
must be applied with reluctance and scrutiny." *Barrett v. Grow*, 2008 WL 4911206, at \*5 (S.D.
Ind. Nov. 13, 2008) (citing *Wedgewood Ass'n, Inc. v. Nash*, 781 N.E.2d 1172 (Ind. Ct. App.
2003)). For a defendant to successfully assert the doctrine in Indiana, the defendant generally
must show that: 1) the plaintiff's misconduct was intentional; 2) the plaintiff's wrongdoing
concerned the defendant and has an immediate and necessary relation to the matter in litigation;
and 3) the defendant was injured because of the plaintiff's conduct. *See id.*

The Court need not engage in a step-by-step analysis to conclude that the doctrine of
unclean hands does not apply here. The crux of the Defendants' argument in favor of this
defense is that Wilmington Trust, in the spring of 2020, exacerbated the Defendants' default by
directing the tenant of the property underlying the Loan to make rent payments directly to it
instead of to 410. (DE 70 at 18–19.) The Defendants' only evidentiary basis for its claim is an
affidavit from Defendant Sol Dayan, (DE 70 at 19); (DE 58 at 4), which the Court does not
consider because the relevant portions contain only legal argument and conclusory allegations,

*see Greene v. Westfield Ins. Co.*, 963 F.3d 619, 627 (7th Cir. 2020) ("affidavits are for stating facts, not legal conclusions"). More importantly though, the Defendants' argument appears to ignore that 410 agreed to allow Wilmington Trust to direct rent payments from the tenant when 410 executed the Subordination, Non-Disturbance and Attornment Agreement ("SDNA") as part of the loan documents. (DE 48-4 at 19, 23) ("[410] by its execution of this Agreement hereby consents to such direct payments by Tenant to Mortgagee and hereby releases and discharges Tenant of, and from all liability to Landlord on account of any such payments."). The Defendants cannot now turn around and allege that Wilmington Trust's taking an action that 410 explicitly agreed to is misconduct that warrants application of the doctrine of unclean hands. The Defendants' defense thus fails and does not preclude summary judgment.

### 3. Wilmington Trust's Claims

Having found that the Defendants' merit-based arguments against summary judgment all fall short, the Court moves to explain why the agreed facts support granting each of the four claims Wilmington Trust has moved for here. The only remaining dispute with respect to the four claims is whether Wilmington Trust has provided a sufficient basis for the fees and damages it seeks along with its request for judgment on its first two claims.

#### a.    Count 1 – Borrower's Breach of Note

##### 1)    The merits

Wilmington Trust has moved for a judgment finding that 410 defaulted under the terms of the Note both by failing to make necessary installment payments and by engaging in unauthorized transfers and executing unauthorized liens. (DE 48-2 at 4–19; 64-1 at 7–8.) The undisputed facts support summary judgment in Wilmington Trust's favor.

First, there is no dispute that 410 defaulted under the Note. The limited liability company missed its December 2019 monthly payment and then continued to miss monthly payments thereafter. Each missed payment qualified as an Event of Default under the terms of the Note. (DE 48-1 at 11; DE 48-2 at 83–84.) Upon an Event of Default, the loan documents gave Wilmington Trust the ability to declare the entire debt to be "immediately due and payable." (*Id.*) (explaining that the "entire debt" included "the outstanding principal balance, all accrued interest, all costs, expenses, charges and fees payable under the Loan Document, and Yield Maintenance Premium"). Thus, 410's missed payments not only meant it defaulted on the Note but also that Wilmington Trust was empowered to accelerate the fees and other payments due under the Note, which it chose to do. (DE 48-4 at 70–74.)

Second, it is also undisputed that 410 triggered provisions in the loan documents by engaging in transfers and executing liens on the underlying real estate without Wilmington Trust's prior consent that transformed the Loan from a non-recourse loan into a full recourse loan. The Note expressly provided that 410 would be responsible for the full amount of the Loan and any related fees and expenses if it engaged in such activity. (DE 48-1 at 15) ("Borrower and any general partner of Borrower shall be personally liable for the Debt if . . . Borrower fails to obtain Lender's prior written consent to any Transfer . . . or . . . fails to obtain Lender's prior written consent to any Indebtedness . . . . or voluntary Lien . . . encumbering the Property"). The loan documents defined a "Transfer" as selling, conveying, mortgaging, granting, bargaining, encumbering, pledging, assigning, granting options with respect to, or otherwise transferring or disposing of the underlying property or any part or legal or beneficial interest in the property. (DE 48-2 at 62–63.) And it defined a "lien" as:

> any mortgage, deed of trust, deed to secure debt, indemnity deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance,

> charge or transfer of, on or affecting [410], the Property, any portion thereof, or any interest therein, including any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

(DE 48-2 at 17.)

410 was involved in three unauthorized transfers. The first transfer occurred when Mr. Rudich pledged his interest in 410 to Defendant Scopus Equity, LLC in August 2018 (DE 48-5 at 22–29) and the second occurred when Mr. Rudich pledged that same interest to Defendant Red Realty in April 2019 (DE 48-4 at 46–52). The third transfer occurred when 410 conveyed the real estate underlying the Loan to Defendant TAC Capital by a quitclaim deed that was recorded in December 2019. (DE 48-4 at 66–68.) 410 has not disputed that these transfers occurred or that they occurred without Wilmington Trust's prior written consent.

410 was also involved in four declarations of restriction that were placed on the underlying real estate. 410 executed the first restriction in favor of Defendants Judah Zelmanovitz and Neil Fink in April 2018. (DE 48-4 at 54–56.) It executed the second restriction in favor of Defendant Law Offices of David Fleischmann, P.C. in February 2019. (DE 48-4 at 58.) It then allowed a third restriction involving Defendant Levitin & Associates (DE 48-4 at 60) and executed a fourth restriction in favor of Mr. Dayan (DE 48-4 at 62), both of which occurred in April 2019. Each restriction qualified as a "lien" under the Note because each contained language assuring the holder of the restriction that 410 would not "sell, mortgage, assign, lease, convey, transfer, encumber, pledge, hypothecate, or otherwise take any action creating security interest" in the underlying real estate without the holder's written consent. (DE 48-4 at 54–62.) 410 does not dispute any of these facts, all of which are corroborated by documents in the record. And because there is no dispute of material fact that 410's actions constituted events of default

under the Note, the Court finds summary judgment in favor of Wilmington Trust is warranted on its first claim.

2)      Appropriate relief

That finding still leaves the question of what relief Wilmington Trust is owed for 410's default, however. In Wilmington Trust's most recent filing on summary judgment, it requested judgment in the amount of $4,563,292.27 in fees and interest plus $5,874 in outstanding attorneys' fees. (DE 72 at 11.) The Defendants argued that the Court cannot find any amount Wilmington Trust has moved for proper at this stage because there are genuine disputes of material fact about the amount of relief to be awarded. (DE 70 at 20–25.) The Defendants' argument against an award of relief broke down into two parts. First, they argued that Wilmington Trust failed "to point to any provisions within any agreements between the parties carving out entitlement to [the] fees and interest payments" that Wilmington Trust listed in support of the $4,563,292.27 amount. Second, they argued that Wilmington Trust supplied timesheets in support of the attorneys' fees that are too vague. (DE 70 at 20–25.) The Defendants are mistaken on both points. A review of the documents Wilmington Trust has provided, including the loan documents themselves and affidavits from Kaveh Saberi, a Rialto Capital Advisors vice president, and Cara Houck, Wilmington Trust's counsel, shows that the requested relief is both well-supported and reasonable.

Before digging into why those documents support Wilmington Trust's requested relief, however, the Court must first discuss why, contrary to the Defendants' arguments, Mr. Saberi's affidavit is properly before the Court for consideration. The Defendants had argued that Mr. Saberi's affidavit was improper because he did not have the required personal knowledge to swear to the information contained in his affidavit. (DE 70 at 21–24.)

Any affidavit or declaration "used to support or oppose a motion for summary judgment must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Personal knowledge may include reasonable inferences which are "grounded in observation or other first-hand personal experience." *Payne v. Pauley*, 337 F.3d 767, 772 (7th Cir. 2003). And when it comes to testifying about business records, the custodian who testifies need not be the one who personally gathered the business record and need not be in control of or have individual knowledge of the particular corporate records to be deemed to have personal knowledge. *Cocroft v. HSBC Bank USA, N.A.*, 796 F.3d 680, 686 (7th Cir. 2015). Instead, the custodian "need only be familiar with the company's recordkeeping practices." *Id.* (dispensing with the same challenge the Defendants have raised in this case).

Mr. Saberi's affidavit meets the personal knowledge requirement. The affidavit was based on Mr. Saberi's knowledge of Rialto's business records and mode of operations as someone who has access to and knowledge of "the loan documents, the account of the Loan including payment histories and outstanding amounts due, and all other documents processed by [Wilmington Trust] that relate to the Loan and its administration." (DE 64-1 at 24–25.) He made clear that his statements, as well as a chart he included that shows the amount due and owing on the Loan and breaks the amounts down by fee and interest category, were based on Rialto's business records. (*Id.*) The Defendants have pointed to no evidence suggesting that any of the business records at issue were inaccurate or unreliable. And Mr. Saberi provided sufficient indicia of their reliability by attesting to the fact that the records were made in the regular course of business and close in time to the actions they described. (DE 64-1 at 25); *see Cocroft*, 796 F.3d at 686 ("This comports with the very rationale underlying the business record exception to

the hearsay rule"); *see also United States v. Birchem*, 883 F. Supp. 1334, 1342 (D.S.D. 1995), *aff'd*, 100 F.3d 607 (8th Cir. 1996); Fed. R. Evid. 803. The Court thus finds Mr. Saberi's affidavit complies with Rule 56(c)(4) and that its contents can be used to justify Wilmington Trust's requested relief for 410's breach of the Note.

Having determined it can consider Mr. Saberi's affidavit, the Court moves to address the adequacy of Wilmington Trust's support for its requested relief at this summary judgment stage. It breaks its consideration down into two parts to correspond with the two parts of the Defendants' argument. First, the Court addresses the Defendants' argument that Wilmington Trust failed to point to any provisions in the agreements between the parties that entitled it to the fees and interest payments being claimed. Then, the Court moves on to the Defendants' argument that Wilmington Trust's documentation supporting its request for attorneys' fees is too vague.

The Defendants' argument against Wilmington Trust's requested fee and interest amount was only a general allegation that the amounts listed as due and owing in the chart Mr. Saberi provided and in Wilmington Trust's filings themselves were not supported by the language of the loan documents. Importantly, the Defendants did not suggest that better or different calculations would yield the correct amount owed. Instead, they argued that the Court cannot find anything is owed because there is a genuine dispute about whether the loan documents support the fees and interest Wilmington Trust is seeking. (DE 70 at 20–21.)

The Court finds there is no genuine dispute of material fact that Wilmington Trust is owed $4,563.292.27 in fees and interest after 410's default on the Note. Contrary to what the Defendants have argued, every cited payment for fees and interest finds support in both the loan documents and Mr. Saberi's affidavit. (DE 48-1; DE 48-2; DE 64-1 at 26.) Wilmington Trust

made the analysis easy by including a chart in its reply brief that explained the basis for each of

the fee and interest amounts Mr. Saberi listed in his affidavit as well as a reference either to the

specific loan document or business practice that supported each amount:

| Element of Debt | Amount | Note § (DE 48-1) | Loan Agreement § (DE 48-2) | Description |
|---|---|---|---|---|
| Unpaid Principal | $3,000,000 | §1 | §1.1 at 13 | § 1 of the Note describes the "Original Principal Amount" and "Outstanding Principal Amount." § 1.1 of the Loan Agreement includes a definition for "Original Principal Amount." |
| Accrued Note Interest | $209,790.03 | §7 | N/A | On an Event of Default, Lender is entitled to 5% interest on the Outstanding Principal Balance (Default Rate). Interest shall accrue at the Default Rate until all Events of Default have been waived in writing by Lender. |
| Default Interest | $287,916.67 | §7 | N/A | On an Event of Default, Lender is entitled to 5% interest on the Outstanding Principal Balance (Default Rate). |
| Late Fees | $9,885.14 | §6 | N/A | Late Charges are incurred where payments are not received within 5 days of their due date; the Late Charge is the lesser of 5% of the full amount of the sum due or the maximum amount permitted by law. |
| NSF Fees | $200 | N/A | N/A | As an industry standard, NSF Fees apply in cases of insufficient funds. |
| Special Servicer (SS) Fees | $60,689.66 | N/A | §9.5 | Borrower shall promptly reimburse Lender on demand for costs and expenses payable by Lender to Servicer as a result of the Loan becoming specially serviced. |
| Workout Fees | $41,171.54 | N/A | §9.5 | Borrower shall reimburse lender for any workout fees and special servicing fees due and payable to Servicer. |
| Protective Property Advances | $80,047.64 | §8 | N/A | Origination, Administration, Enforcement, and Defense Expenses: All such Expenses shall be additional Debt and may be funded by the Lender making an advance on Borrower's behalf. |
| Interest on Advances | $3,504.21 | §8 | N/A | Origination, Administration, Enforcement, and Defense Expenses: |

| | | | | All such Expenses will accrue interest at the Default Rate. |
|---|---|---|---|---|
| Yield Maintenance | $920,294.04 | §9(c) | N/A | The Yield Maintenance Premium can be applied by the Lender and shall become immediately due and owing in the event of any acceleration of the Loan. |
| Payoff Processing Fee | $400 | N/A | §9.5 | Borrower shall promptly reimburse Lender on demand for costs and expenses payable by Lender to Servicer as a result of the Loan becoming specially serviced. |
| Replacement Reserve Balance | ($4,160.00) | N/A | §7.3 | Borrower shall pay Lender $208.00 for an initial deposit and the same amount on each Payment Date thereafter; these amounts are collectively the "Replacement Reserve Fund." |
| Suspense Balance | ($86,446.66) | N/A | N/A | See payment history (DE 64-1 at 26.) |

(DE 72 at 4–5.)

The Court has reviewed Wilmington Trust's chart along with the relevant loan documents to which it cited and determined that it is not only correct, but supports Wilmington Trust's request for a monetary judgment. The only fee not derived from the loan documents is the $200 amount for "NSF fees," which Wilmington Trust has correctly noted are an industry standard that apply in cases of insufficient funds. (DE 72 at 5); *see* James J. White, NSF Fees, 68 Ohio St. L.J. 185, 200 (2007) (proposing increased regulation of NSF funds but acknowledging they are widely used in the financial industry). There is no evidence before the Court that any party associated with computing the amount owed made up any of the required fees or interest, erred in any calculations, or artificially inflated the amount. The Court thus finds that Wilmington Trust is entitled to judgment in the amount of $4,563,292.27 for fees and interest owed after 410's default on the Note.

Having determined the request for fees and interest is appropriate, the Court turns to whether the evidence is sufficient to support the additional award of $5,874 in outstanding

attorneys' fees. (DE 72 at 11.) The Defendants opposed the inclusion of any attorneys' fees in a judgment because they argued that the accounting of attorneys' fees in the time sheets attached to Ms. Houck's affidavit and used to support the request was too vague. (DE 70 at 21–24.)

As an initial matter, the Defendants have not disputed that reasonable attorneys' fees would be appropriate. Nor should they given that the loan documents explicitly require 410 to pay "any and all expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest" in the property and enforcing its rights after an event of default. (DE 48-3 at 7, 15). Thus, the only potential dispute is whether the evidence of attorneys' fees Wilmington Trust submitted is too vague to justify an award.

"A court should not award attorney's fees to a party for time entries that are so vague that it is impossible to discern whether the time is excessive or even relevant to the claim on which the plaintiff prevailed." *Crispin R., Jr. v. Bd. of Educ. of the City of Chicago, Dist. 299*, 2010 WL 3701328, at *6 (N.D. Ill. Sept. 10, 2010). The standard for evaluating the itemization and detail of submitted attorney time sheets is whether a paying client would find it satisfactory. *In re Synthorid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("If counsel submit bills with the level of detail that paying clients find satisfactory, a federal court should not require more."). And although block billing "does not provide the best possible description of attorneys' fees, it is not a prohibited practice." *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 569 (7th Cir. 2006).

Plaintiff's counsel's billing entries are reasonable and support the relief requested. Despite what the Defendants have alleged, a review of the numerous pages of billing information shows that the descriptions of the work include the specific tasks being performed, the amount of time spent on those tasks, and, when necessary, appropriate context for why those tasks were

being performed. (DE 64-1 at 35–53.) The Defendants' arguments in opposition to the attorneys' fees present no evidence that the fees are actually wrong or inflated. The Defendants merely sought to cast doubt by cherry picking certain entries and then suggesting, for example, that because the Court cannot know the exact details of a conversation listed in an entry, the exact content of a listed email, or the exact breakdown of how a 2.4-hour entry was allocated between six tasks, the entries were not reasonable. The Defendants may want to know every detail of Plaintiff's counsel's work, but the Court need not parse the time sheets so closely. The time sheets are far from vague, provide the kind of detail that allows the Court to deem the work and charges reasonable, and are of a type that a paying client would certainly find adequate.[2] *See Hensley v. Eckerhart*, 461 U.S. 424, 436–37 n.12 (1983) (an attorney "is not required to record in great detail how each minute of his time was expended . . . but . . . should identify the general subject matter of his time expenditures"); *Synthroid*, 264 F.3d at 722. The Court thus finds Wilmington Trust has properly sought $5,874 in outstanding attorneys' fees as part of the relief for 410's breach of the Note.

     *b.    Count 2 – Breach of Guaranty*

     Wilmington Trust has next moved for a judgment in its favor finding that Defendant Moshe Rudich, as guarantor, is also liable for the $4,569,166.27 that the Court found 410 to be liable for in the prior subsection. Mr. Rudich has taken no action to plead or otherwise defend himself in this case and there is a valid Clerk's Entry of Default against him. (DE 28.) He has thus raised no disputes of material fact and in no way has questioned the validity of Wilmington

---

[2] The Court also notes that of the $132,114.50 in attorneys' fees accounted for on the time sheets (DE 64-1 at 49), Wilmington Trust has only requested "$5,874 in outstanding attorneys' fees" as part of its motion for summary judgment (DE 72 at 11). This suggests to the Court that the paying client has in fact found the specificity in the time sheets adequate and paid much of the amount due already.

Trust's request that he be found liable for breaching the Guaranty Agreement. He agreed as guarantor to "absolutely and unconditionally guarantee full and punctual payment and performance when due" if 410 failed to secure Wilmington Trust's prior written consent to any transfer or any indebtedness or voluntary lien encumbering the underlying property. (DE 48-3 at 51–52.) As the Court has already established, there were numerous such transfers and liens that 410 executed (DE 48-4) that, along with the missed installment payments, made 410 liable for the $4,569,166.27 in fees and interest. Mr. Rudich is equally liable for that amount under the terms of the Guaranty Agreement. (DE 48-3 at 51–52.) There is no dispute that Mr. Rudich has not made payments toward that amount and thus has breached the Guaranty Agreement. Wilmington Trust is thus entitled to summary judgment on its breach of guaranty claim and its request that Mr. Rudich's liability for the amount owed in fees and interest be coextensive with 410's.

### c.      Count 3 – Foreclosure of Mortgage

Wilmington Trust has additionally moved for summary judgment on its claim against all named defendants for recognition of its ability to foreclosure on the underlying mortgage. The mortgage document and the undisputed fact that 410 defaulted on the Note support such a finding. 410 agreed in the mortgage document that "[u]pon the occurrence and during the continuance of any Event of Default (as defined in the Loan Agreement) . . . Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against [410] and in and to the Property," including by instituting "proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument." (DE 48-3 at 14–16.) Wilmington Trust, which was the valid assignee of the original lender's interest in the mortgage,

can thus properly foreclose on the mortgage given the undisputed events of default already detailed.

Further, Wilmington Trust's mortgage interest in the underlying real estate is superior to any underlying interest in the real estate that any of the defendants may have as a result of the various transfers that took place and liens that were executed. No defendant in this case has disputed that their own interests in the underlying real estate, to the extent they have them, are inferior to Wilmington Trust's. And even if any defendant had disputed the hierarchy of interests, Wilmington Trust's interest is clearly superior under the law. In Indiana, a mortgage "takes priority according to the time of its filing." Ind. Code § 32-21-4-1. The mortgage in which Wilmington Trust has an interest was properly recorded on April 2, 2018 (DE 48-3 at 2), while all of the defendants' restrictions and transfers related to the underlying real estate were recorded or took place after April 2018 (DE 48-4). Wilmington Trust's mortgage interest is thus legally superior, and the Court thus grants Wilmington Trust's request for summary judgment on its third claim.

> ### d.    Count 4 – Foreclosure of Personal Property

The final count Wilmington Trust has moved on seeks foreclosure of personal property under the terms of the mortgage. 410, through the mortgage document, "irrevocably mortgage[d]" property including the land, equipment, fixtures, personal property "and the right, title and interest of [410] in and to any of the Personal Property," leases, and rents associated with the underlying real estate. (DE 48-3 at 3–5.) The mortgage also provided that 410 granted Wilmington Trust "as security for the Obligations . . . a security interest in the Fixtures, the Equipment and the Personal Property" such that if an Event of Default occurred, Wilmington Trust could avail itself of "any and all rights and remedies granted to a secured party upon

default under the Uniform Commercial Code, including the right to take possession of the Collateral." (DE 48-3 at 7–8.) Further, the Assignment of Rents provided that after an Event of Default, 410's license to collect and retain rents would immediately terminate and Wilmington Trust would be empowered to take possession and control of the underlying real estate to operate it itself or to have a receiver appointed. (DE 48-3 at 38–39.)

None of the defendants have disputed the validity or applicability of any of that language to the situation in which the parties find themselves. And the language clearly entitles Wilmington Trust to foreclose on the personal property associated with the real estate. (DE 48-4 at 32); *see also* Ind. Code § 26-1.9.1-610 (a secured party may "take possession of the [covered] collateral and without removal, may render equipment unusable and dispose of collateral on a debtor's premises"). There is also no dispute that the interest Wilmington Trust has in the associated personal property and fixtures was perfected in April 2018 (DE 48-4 at 2, 9). That gives Wilmington Trust a superior interest when compared to any of the defendants in this case. (DE 48-4); Ind. Code § 26-1-9.1-322(a)(1)-(2). The Court thus finds that summary judgment on Wilmington Trust's claim for foreclosure of personal property is appropriate.

### 4.      *Defendants' Counterclaims*

Having found that Wilmington Trust's motion for summary judgment on its own claims should be granted in its entirety, the Court now switches tracks to Wilmington Trust's other motion under consideration in this order. In that motion, styled as a motion to dismiss, Wilmington Trust sought to rid this case of the Defendants' two counterclaims. (DE 54; DE 54-1.) Because the Defendants' two counterclaims, one for breach of contract and one for negligent misrepresentation, rely almost entirely on the same arguments that the Defendants raised in

opposition to Wilmington Trust's motion for summary judgment on its affirmative claims, the Court's analysis here will be brief and incorporates its prior analysis by reference.

Before reaching that analysis though, the Court first explains why it is choosing to treat Wilmington Trust's motion to dismiss as a motion for summary judgment instead. The core reason is that Wilmington Trust's motion is a motion to dismiss in title only. The entire body of the motion is styled as a motion for summary judgment, including a "standard of review" section that only recounts the summary judgment standard. (DE 54.) And Wilmington Trust attached outside materials to the motion, including a different affidavit from Mr. Saberi (DE 54-1 at 13–16), the Balance Statement Keybank sent in March 2020 (DE 54-1 at 18), and a copy of an April 10, 2020, letter from Ms. Houck (DE 54-1 at 20–21). All of those documents would be irrelevant to the Court's consideration of a pure motion to dismiss.

Under Federal Rule of Civil Procedure 12(d), the Court must convert a motion to dismiss under Rule 12(b)(6) into a motion for summary judgment under Rule 56 if "matters outside the pleadings are presented to and not excluded by the Court." Fed. R. Civ. P. 12(d). It is within the Court's discretion to decide how to proceed given the outside materials. *See Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998). If the Court chooses to convert the motion to a motion for summary judgment, all parties must have "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). "Adequate notice is provided when the moving party frames its motion in the alternative as one for summary judgment." *Tri-Gen Inc. v. Int'l Union of Operating Eng/rs, Loc. 150*, 433 F.3d 1024, 1029 (7th Cir. 2006).

Conversion is appropriate under these circumstances. First, the substance of Wilmington Trust's motion, discussed above, clearly suggests that Wilmington Trust meant to frame it as a motion for summary judgment. Second, while the Defendants have argued that the motion was

premature, they have not argued against conversion of the motion to one for summary judgment. Instead, they chose to defend against the motion as if it had been a motion for summary judgment from the start. (DE 60) (including a "Statement of Genuine Issues" and solely citing the summary judgment standard in their response's standard of review section). The Defendants also attached two affidavits to their response, which further suggests they intended to defend against the motion as if it were one for summary judgment. The Court finds the parties had a reasonable opportunity to present all the material pertinent to the motion and had adequate notice that the Court would treat the motion as one for summary judgment.

Having explained the conversion, the Court next moves to the substance of the motion, starting with Wilmington Trust's request for summary judgment on the Defendants' breach of contract counterclaim. The Defendants' claim is based on the same Balance Statement that the Defendants argued created a genuine dispute of material fact for purposes of Wilmington Trust's affirmative summary judgment motion. (DE 60 at 9.) As was true in the prior analysis, there is no basis to find that the Balance Statement, which disavowed any impact on the terms or default status of the Loan, could qualify as an agreement under the ILLA or a contract under the traditional norms of contract formation. (DE 54-1 at 18); *see* 26-2-9-4(b) (ILLA standard); *Batchelor*, 853 N.E.2d at 165 (contract formation standard). Thus, the Court finds that summary judgment on the Defendants' first counterclaim in favor of Wilmington Trust is warranted.

The Defendants' second counterclaim, for negligent misrepresentation, fares no better. To succeed on a claim for negligent misrepresentation, a party must show four elements: (1) the defendant, in the course of his business profession, or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions; (2) the defendant fails to exercise reasonable care or competence in

obtaining or communicating the information; (3) the plaintiff justifiably relies upon the information supplied by the defendant; and (4) the plaintiff suffers pecuniary loss as a result. *See Wakley v. Sustainable Loc. Foods LLC*, 2017 WL 1880814, at *3 (S.D. Ind. May 9, 2017).

The negligent misrepresentation claim mirrors the promissory estoppel defense the Court discussed earlier in this order and relies, once again, on the Defendants' flawed reading of the Balance Statement. The Balance Statement made clear it was not making any representations about reinstating the Loan or curing defaults. (DE 54-1 at 18.) There was thus no false information supplied in the Balance Statement and no basis to find the Defendants justifiably relied on the Balance Statement in thinking they were being given an opportunity to reinstate the Loan and cure the defaults. The Defendants' references to various portions of Mr. Dayan's affidavit once again do nothing to change the Court's conclusion. The portions of the affidavit are solely legal conjecture and self-serving allegations unsupported by evidence. *See Greene*, 963 F.3d at 627. Summary judgment on the Defendants' negligent misrepresentation counterclaim in favor of Wilmington Trust is thus appropriate.

## D. Conclusion

For the foregoing reasons, the Court GRANTS Wilmington Trust's Motion to Dismiss Defendant/Counterclaimants 410 South Main, Red Realty Holdings, and Sol Dayan's counterclaims (DE 54). It further GRANTS Wilmington Trust's Motion for Summary Judgment on Counts 1, 2, 3, and 4 of the amended complaint (DE 64), with relief due to Wilmington Trust in the amount of $4,563,292.27 plus $5,874 in outstanding attorneys' fees and with Defendants 410 South Main and Moshe Rudich each liable for the full amount of that relief. Because the Court has granted Counts 1 through 4 of Wilmington Trust's second amended complaint, Count 5 is now moot and is thus DISMISSED. Additionally, because this order resolves this case and

obviates any need for potential discovery, the Court DENIES Wilmington Trust's Motion for Protective Order (DE 57) as moot. The Clerk is DIRECTED to enter judgment in favor of the Plaintiff.

SO ORDERED.

ENTERED: February 7, 2022

_____/s/ JON E. DEGUILIO_____
Chief Judge
United States District Court